**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

ASSEMBLY COMPONENT SYSTEMS, INC.,

          Plaintiff,

    v.                                          Case No. 09-CV-778

PLATINUM EQUITY, L.L.C., and
TECUMSEHPOWER COMPANY,

          Defendants.

## ORDER

On August 11, 2009, plaintiff Assembly Component Systems, Inc., ("ACS") brought suit against Platinum Equity, LLC, ("Platinum") and one of Platinum's subsidiaries, TecumsehPower Company ("Tecumseh"). The complaint asserts a breach of contract claim against Tecumseh, a tortious interference claim and a direct participant liability claim against Platinum, and a claim for declaratory and injunctive relief against both Platinum and Tecumseh. Defendants have moved for dismissal of each of the ACS's claims.

### BACKGROUND

ACS is a company that manages inventory of customer-specific parts to be used in its customers' manufacturing operations. (Compl. ¶ 6). Tecumseh is a company that manufactures small engines. (Id. ¶ 12). On May 5, 2005, Tecumseh and ACS signed an "Inventory Management Agreement" ("the Agreement"), (Id.

¶ 14), whereby ACS would provide its services to three of Tecumseh's facilities, including Tecumseh's facility in Dunlap, Tennessee.

Section 1.2 of the Agreement obligated ACS to "order[] and maintain[] inventory of product for [Tecumseh] as set forth on . . . Exhibit A." (Dkt. #26, Ex. A).[1] The same section further stated that "Exhibit A may be amended from time to time by mutual agreement of the parties." (Id.). The Exhibit A referenced in the Agreement was not executed at the time the Agreement was signed. Rather, section 2.1 of the Agreement specified that "[t]he initial Exhibit A [would] be prepared by [Tecumseh]" and that "Exhibit A [would] set forth the minimum and maximum stock level for each Product, and the maximum commitment quantity levels for each Product." (Id.) Section 2.2 of the Agreement provided an applicable time frame, stating: "As soon as practicable, but in no event later than six (6) months from the date of [the Agreement], [ACS and Tecumseh] [would] meet to review and to establish" certain criteria. (Id.). One such criteria, found in section 2.2.1, was "[m]etrics for all inventory levels on all parts including minimum and maximum inventory requirements and responsibilities/liabilities." Ultimately, Exhibit A was executed pursuant to a July 11, 2006 amendment to the Agreement.

On October 23, 2007, Tecumseh informed ACS that Platinum had recently acquired Tecumseh. (Compl. ¶ 27). On October 10, 2008, Tecumseh informed ACS that Tecumseh was closing its Dunlap facility. (Id. ¶ 33). In response, ACS

---

[1] The Agreement itself is at Docket #26, Exhibit A; "Exhibit A to the Agreement" (i.e. the Exhibit A referenced in the Agreement itself) is at Docket #26, Exhibit C.

-2-

informed Tecumseh that there was $1.72 million of inventory remaining at the warehouse ACS had leased and stocked to service Tecumseh's Dunlap facility, and that Tecumseh was obligated to purchase such inventory from ACS. (Id.). In January 2009, once the Dunlap facility closed, ACS issued an invoice, dated December 23, 2008, in the amount of $1,529,662.92 for the remaining inventory in ACS's Dunlap warehouse. (Id.). On January 12, 2009, Tecumseh disputed that it had any obligation to pay ACS for the unused inventory. (Id. ¶ 34).

## ANALYSIS

### I.      Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the plaintiff's complaint by asserting that the claimant failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), claimant's complaint must allege facts sufficient to "state a claim for relief that is plausible on its face." *Justice v. Town of Cicero*, 557 F.3d 768, 771 (7th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). Pleaders must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 1129 S. Ct. at 1940. However, the court construes the complaint in the light most favorable to the claimant, accepts as true all well-pleaded facts alleged, and draws all possible inferences in the claimant's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

-3-

Normally, the court cannot consider documents outside the pleadings before the district court unless the court converts the defendant's Rule 12(b)(6) motion to one for summary judgment and allows the plaintiff to submit additional evidentiary material of his own. *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). However, a defendant may introduce pertinent documents upon which the plaintiff's action is based if the plaintiff failed to do so. *Id.* These documents are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. *Id.* In the instant case, the Agreement (which includes the July 11, 2006 Amendment, and Exhibit A) is referred to in plaintiff's complaint and is central to plaintiff's claim, thus, it constitutes part of the pleadings, and the court may consider it within the context of defendants' Rule 12(b)(6) motion.

## II.     Breach of Contract Claim

Defendants base their motion to dismiss ACS's breach of contract claim on the premise that the contract conclusively places the risk of loss of undelivered inventory on ACS. Section 3.0 of the Agreement states: "All Products will remain the property of [ACS] until the purchase price has been paid in full. [ACS] will retain and assume responsibility for all local taxes applied to Product inventory under its ownership as well as the risk of loss." (Dkt. #26, Ex. A). Defendants maintain that this contractual provision means that ACS bears the loss associated with the leftover

Case 2:09-cv-00778-JPS    Filed 07/07/10    Page 4 of 28    Document 31

inventory in question. Thus, defendants argue that Tecumseh has no contractual duty to purchase the inventory remaining in ACS's Dunlap warehouse.

ACS disagrees with defendants' interpretation of the risk-of-loss provision. ACS maintains that the risk-of-loss provision pertains merely to loss from casualty, not to every conceivable type of "loss" that may flow from ownership of the inventory. ACS posits that the portions of the Agreement relevant to the issue of the unused inventory are the above-cited Sections 1.2, 2.1, and 2.2.1 – i.e., the portions pertaining to Exhibit A and the applicable minimum and maximum stock levels.

ACS argues that the minimum stock levels referred to in the Agreement, and specified as to each product in Exhibit A, are the minimum threshold levels of inventory as to each product that ACS was obligated, per the Agreement (including Exhibit A) to maintain. ACS explains that the purpose of establishing a minimum level is to ensure that ACS maintains a sufficient level of inventory so as to always be able to timely supply Tecumseh with the component parts it required. Further, ACS argues that the maximum stock levels referred to in the Agreement, and specified as to each product in Exhibit A, are the maximum threshold levels of inventory for which Tecumseh is responsible for compensating ACS. ACS explains that the purpose of establishing a maximum level is to ensure that Tecumseh will be liable for purchasing any unused inventory, up to a certain agreed upon amount (i.e., the maximum stock levels). ACS points out that it would be free to exceed the

-5-

maximum levels, but that Tecumseh would not be liable for purchasing any of the stock that exceeded the maximum.[2]

Just as ACS disagrees with Tecumseh's construction of the risk-of-loss provision, Tecumseh disagrees with ACS's construction of the term "maximum stock level." Thus, the issue before the court is one of contractual interpretation. Tecumseh maintains that the risk-of-loss provision requires that ACS bear the loss resulting from leftover inventory subsequent to Tecumseh closing its Dunlap facility, and that the term "maximum stock level" as used in the Agreement and Exhibit A does not embody a promise on Tecumseh's part to purchase any unused inventory up to those specified maximum amounts. ACS, on the other hand, maintains that the risk-of-loss provision pertains only to loss due to casualty, and that the term "maximum stock level" carries within the term itself a promise on Tecumseh's behalf to purchase unused inventory up to those specified maximum amounts.

## A.    Legal Standard

Section 14.11 of the Agreement specifies that the Agreement shall be governed by Delaware law, without regard to the principles of the conflicts of laws thereof. The parties concur that Delaware law governs the contract. Because choice-of-law clauses are presumptively valid, and reasonable choice-of-law provisions should be enforced, *Berry Floor USA, Inc. v. Faus*, 2008 WL 4610313 at

---

[2] Indeed, according to Section 9.4 of the Agreement, if, at the time of termination or cancellation of the Agreement, ACS were to have "inventory over the negotiated inventory levels, [Tecumseh] [would] have the option to purchase such Product inventory for 70% of the Price." (Dkt. #26, Ex. A).

-6-

*7 (E.D. Wis. Oct. 15, 2008), the court will construe the Agreement according to Delaware law.

Under Delaware law, the role of the court in interpreting a contract is to effectuate the intent of the parties. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). However, in the absence of ambiguity in the language of the contract, "there is no room for interpretation or a search for the intent of the parties." *Myers v. Myers*, 408 A.2d 279, 280 (Del. 1979). In such a case, "[c]ontract terms themselves [are] . . . controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Eagle Industries, Inc. v. Devilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). But, when certain provisions "are fairly susceptible to different interpretations . . . there is ambiguity," and "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." *Id.*

### B. Risk-of-Loss Provision

To determine if the risk-of-loss provision could be considered ambiguous, the court must determine if in fact the provision is reasonably susceptible to both parties' proffered meanings. Turning first to ACS's proffered interpretation of the clause, the court finds that the provision is reasonably susceptible to the understanding that it pertains exclusively to risk of loss due to casualty. This is because risk of loss provisions are standard elements of a contract that typically do refer to loss due to

Case 2:09-cv-00778-JPS   Filed 07/07/10   Page 7 of 28   Document 31

casualty. *See* 1 White & Summers, *Uniform Commercial Code* § 5-1 (5th ed. 2006) (discussing "risk of loss" solely within the context of loss due to casualty). Thus, without some explanation that the risk-of-loss provision in the Agreement was meant to encompass loss beyond casualty, ACS could reasonably have understood the term "risk of loss" to have its usual ordinary meaning. The term's usual and ordinary meaning, according to *Black's Law Dictionary*, is: "The danger or possibility that a party will have to bear the costs and expenses for the damage, destruction, or inability to locate goods or other property." *Black's Law Dictionary* (8th ed. 2004). Hence, "risk of loss" is reasonably susceptible to the meaning advanced by ACS.

Turning to defendants' proffered interpretation of the clause, the court finds that when read in isolation the provision is susceptible to defendants' construction, but such susceptibility diminishes significantly once the Agreement is read in its entirety. If there were no reference to "maximum stock levels," then the only provision of the contract that could ostensibly deal with liability as to unused inventory would be the risk-of-loss provision, and at that point it would be arguable that the risk-of-loss provision applied to unused inventory. However, "[i]n upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985). It strongly appears that the only way to give effect to the provisions dealing with maximum stock levels, is to hold that the risk-of-loss provision does not apply to loss due to left over inventory upon the closing of one of

Case 2:09-cv-00778-JPS   Filed 07/07/10   Page 8 of 28   Document 31

Tecumseh's facilities. If the risk-of-loss provision did apply to such a situation, then it would make no sense for maximum stock levels to be an element (especially a negotiated element)[3] of the Agreement. Because the only motion presently before the court is defendants' motion to dismiss, there is no reason for the court to go further and find that the risk-of-loss provision is not ambiguous and that it is only susceptible to ACS's proffered construction. Rather, it is enough at this stage of the proceedings to find that the risk-of-loss provision does not render ACS's breach of contract claim meritless.

### C.    Maximum Stock Levels

ACS posits that the term "maximum stock level" and "Max Stock," as used in the Agreement and <u>Exhibit A</u>, means essentially "the amount of inventory up to which Tecumseh is obligated to purchase if not purchased in the regular course of business." Meaning, if a part became obsolete, or if the relationship were terminated, or if the applicable facility were closed, then under ACS's proffered construction of the references to maximum stock levels, Tecumseh would be liable to purchase all remaining applicable inventory up to the max stock level. Hence, under ACS's proposed construction of the terms, the obligation is inherent in the term. Thus, if the meaning ACS advocates is accepted, it would be irrelevant that

---

[3] Section 9.4 of the Agreement makes it clear that the maximum stock levels were indeed negotiated.

Case 2:09-cv-00778-JPS    Filed 07/07/10    Page 9 of 28    Document 31

the Agreement does not expressly obligate Tecumseh to purchase all unused inventory up to the maximum stock level.[4]

The court finds that ACS's proffered meaning of "maximum stock levels" and "Max Stock" is a meaning to which the applicable language of the Agreement is susceptible. While "maximum stock level" is not defined anywhere in the contract (a major shortcoming of those responsible for drafting the Agreement), the simple fact is that it is clearly a negotiated and important element of the contract, and there also simply does not appear to be any other meaning that the terms could reasonably encompass. It is axiomatic that "[c]ontracts are to be interpreted in a way that does not render any provisions 'illusory or meaningless.'" *O'Brien v. Progressive Northern Ins. Co.*, 785 A.2d 281, 287 (Del. 2001). Thus, the court cannot simply ignore the language regarding maximum stock levels; clearly it must be given some meaning. Because the Agreement clearly specifies in Section 3.0 that ACS bears the burden of the carrying costs of inventory, and retains the risk of loss to inventory while it is in its possession, it plainly appears that unless maximum stock levels means what ACS proposes it means, then there is absolutely no reason for the provision to have been included in the contract. If Tecumseh were not obligated to purchase unused inventory up to the maximum level, then it would seem unreasonable for Tecumseh to have any interest whatsoever in how much inventory

---

[4] This is not to say that there is no need for the Agreement to include such an express provision. Indeed, had such clear language been included, this case would have likely never been brought, and the parties would have saved a great deal of resources that they have since expended, and will continue to expend, on litigation.

Case 2:09-cv-00778-JPS   Filed 07/07/10   Page 10 of 28   Document 31

(so long as it exceeded the minimum levels) that ACS carried at any given time. However, as already noted, the maximum stock levels were a negotiated term of the Agreement.

Perhaps tellingly, defendants do not proffer an alternative construction for the maximum-stock-levels terms. Defendants reject that such terms mean the amount of inventory Tecumseh was obligated to purchase if unused; however, they offer no explanation of what the terms mean. As previously explained, it is downright unreasonable to think that the terms are a limit on the amount of inventory ACS may carry, if the carrying of such inventory had no consequences for Tecumseh. Defendants argue that "[a]s the party paying the inventory carrying costs, it was in ACS' [sic] direct financial interest to have a limit on the maximum amount of inventory that ACS was required to warehouse." (Defs. Reply Br. Supp. Mot. Dismiss at 5). That argument, however, does not make any sense. In order to honor its obligations to Tecumseh, ACS had to maintain the *minimum* inventory levels; those are the levels that dictate how much inventory ACS *must* carry. Thus, defendants' assertion that "[a]bsent maximum inventory levels, ACS could have been contractually obligated to expend substantial additional costs for larger amounts of inventory" (Id.), appears to be demonstrably untrue. Indeed, the only way such a statement could be true would be if there were no minimum levels. If there were no minimum levels, and ACS was simply in breach if it were unable to immediately fulfill an order from Tecumseh, then maximum levels would protect

-11-

ACS. However, if ACS was compliant with the Agreement (at least in regards to inventory levels) so long as it met the minimum stock levels, then the maximum levels were of no benefit to ACS (unless maximum stock levels mean what ACS says they mean, in which case they were a benefit to both parties). Therefore, to rule that the terms regarding maximum stock levels did not carry any obligation for Tecumseh would be to render those terms meaningless.

### D.    Sufficiency of Breach of Contract Claim

Defendants moved for dismissal of ACS's breach of contract claim on the theory that the claim was clearly baseless due to the language of the risk-of-loss provision. The court, however, finds that at best the risk-of-loss provision is ambiguous, and at worst it clearly does not pertain to ACS's breach of contract claim. Were the case before the court on summary judgment, it would be appropriate to resolve which one of the latter two situations pertains. As the case is before the court on a motion to dismiss, it is sufficient to find that the risk-of-loss provision does not warrant dismissal of ACS's breach of contract claim. Similarly, the fact that the terms referring to the "maximum stock levels" are either ambiguous, or clearly refer to the levels of inventory up to which Tecumseh would be liable, means that ACS's breach of contract claim should not be dismissed.[5]

---

[5] Defendants also argue that their contention is supported by language used on the purchase order forms utilized by the parties; however, section 1.6 of the Agreement states: "In the event of a conflict between the terms of this Agreement and the terms of [the purchase order form], the terms of this Agreement will control." Thus, because the court finds that the language of the agreement supports ACS's argument, the contrary language in the purchase order is irrelevant and requires no additional analysis.

-12-

### III.    Tortious Interference Claim

Defendants have also moved to dismiss ACS's tortious interference claim, brought against Platinum.  Defendants advance three separate rationales for the dismissal of the tortious interference claim.  The first is that Tecumseh did not breach the Agreement.  That rationale clearly fails as the court has already held that ACS has asserted a valid claim against Tecumseh for breach of contract.  The second rationale is that even if there was a breach, Platinum was privileged to interfere.  The third posited rationale is that ACS has failed to sufficiently plead a tortious interference claim against Platinum.

#### A.    Legal Standard

While the breach of contract claim is governed by Delaware law, per the terms of the Agreement, plaintiff's tortious interference claim is a tort-law claim, not a contract claim, thus it is not subject to the Agreement's choice-of-law provision.  *See International Administrators, Inc. v. Life Ins. Co. of North America*, 753 F.2d 1373, 1376 n. 4 (7th Cir.1985)  ("The choice of law is not made once for all issues; the trend is to decide the applicable law for each issue separately.").  Because this court's jurisdiction is based on diversity, the court "must look to the law of the forum in which it sits for substantive law," which "includ[es] the rules governing choice of law."  *Id.*  The Wisconsin choice of law "methodology applicable to tort cases begins with a presumption that the law of the forum applies unless 'nonforum contacts are of the greater significance,' and ends with an analysis of five 'choice influencing

-13-

factors': predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." *Glaeske v. Shaw*, 661 N.W.2d 420, 427 (Wis. App. 2003) ( citing *State Farm Mut. Auto. Ins. Co. v. Gillette*, 641 N.W.2d 662, 676 (Wis. App. 2003). Given the presumption in favor of the law of the forum, as well as the fact that the parties apparently agree that Wisconsin law applies, and that there is no indication that any of the five factors would weigh against applying Wisconsin law, the court finds that the tortious interference claim is governed by Wisconsin law.

Under Wisconsin law, the elements of tortious interference with a contract are as follows:

(1)     the plaintiff had a contract or prospective contractual relationship with a third party;

(2)     the defendant interfered with the relationship;

(3)     the interference was intentional;

(4)     a causal connection exists between the interference and the damages; and

(5)     the defendant was not justified or privileged to interfere.

*Brew City Redevelopment Group, LLC v. Ferchill Group*, 2006 WI 128, ¶ 37, n. 9, 724 N.W.2d 879. Though lack of privilege is an element of a tortious interference claim, "[t]he burden of proving lack of privilege . . . is generally not ascribed to the plaintiff." *Chrysler Corp. v. Lakeshore Commercial Fin. Corp.*, 389 F. Supp. 1216,

-14-

1221 (E.D. Wis.1975). Rather, it is sufficient that ACS assert, as it has, "that the . . . acts constituting intentional interference [were], in fact, not privileged." *Finch v. Southside Lincoln-Mercury, Inc.*, 2004 WI App ¶ 38, 658 N.W.2d 154.

## B.     Privilege to Interfere

Platinum argues that even if Tecumseh did breach its contract with ACS, and even if Platinum played a role in that breach, a tortious interference claim against Platinum will not lie because Platinum was privileged to interfere. As stated above, lack of privilege on the part of the interfering party is an element of the tort; however, once a plaintiff has alleged lack of privilege, the burden shifts to the one claiming privilege to assert the defense. As such, the only time the court should base a 12(b)(6) dismissal on an affirmative defense, such as "privilege to interfere" is where the plaintiff, in its complaint, has included "facts that establish an impenetrable defense to the claims." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir.2008). Platinum maintains that ACS has included facts that establish that Platinum had a financial interest in Tecumseh, and that any actions it took were to protect that interest, thus establishing that Platinum has an impenetrable defense based on the financial-interest privilege.

The financial-interest privilege is set forth in the *Restatement (Second) of Torts*, § 769, and states:

-15-

One who, having a financial interest in the business of a third person intentionally causes that person not to enter into a prospective contractual relation with another, does not interfere improperly with the other's relation if he
(a) does not employ wrongful means and
(b) acts to protect his interest from being prejudiced by the relation.

*Id.* As an initial matter, it should be noted that ACS disputes whether the financial-interest privilege claimed by Platinum is even applicable in the instant case. Section 769, by its very terms, only purports to apply to instances of tortious interference with "prospective contractual relations," rather than with existing contractual relations. The instant case pertains exclusively to interference with existing contractual relations. However, while the language of § 769 would indicate that the financial-interest privilege is not applicable to tortious interference with an existing contract, Seventh Circuit case law establishes that the financial-interest privilege is a legitimate defense to a claim of tortious interference with an existing contractual relationship. In *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 898 F.2d 512, 516 (7th Cir. 1990), a Wisconsin case, the Seventh Circuit applied § 769's financial-interest privilege to a claim of tortious interference with an existing contract. Because the Seventh Circuit offered no explanation for why it was extending § 769 beyond its terms, ACS argues that *Allen* is not binding, and this court is free to hold that financial-interest privilege is not a defense to a claim of tortious interference with an existing contract. ACS is mistaken. Such a ruling would require an express refutation of *Allen*, and is thus beyond the powers of this court. The fact that the Seventh Circuit did not explain why it was applying § 769 to an existing contract

-16-

does not mean that this court is not bound by the precedent the Seventh Circuit created in doing so. Accordingly, the financial-interest privilege is a valid defense to a claim of tortious interference with an existing contract.

Next, the court must determine whether ACS has pled facts establishing that Platinum has an impenetrable defense, based on the financial-interest privilege, to ACS's tortious interference claim. There is no debate that Platinum had a financial interest in Tecumseh, and that if Platinum did act to cause Tecumseh not to buy unused inventory from ACS, then it did so to protect its own financial interest in Tecumseh. Thus, the answer to whether Platinum's financial-interest defense has been impenetrably established hinges on whether ACS has plausibly alleged that Platinum utilized wrongful means.

ACS alleges that Platinum disregarded corporate boundaries, and that Platinum engaged in misrepresentation. It is clear from ACS's complaint that Platinum's "disregard of corporate boundaries" was manifested in Platinum either encouraging or directing Tecumseh to cease purchasing unused inventory up to the maximum stock levels from ACS, and to adopt the position that Tecumseh was only financially liable for the product of which it actually took delivery. (Compl. ¶¶ 29, 34-39). As for the misrepresentations Platinum allegedly engaged in, these were manifest in "Platinum improperly caus[ing] [Tecumseh] to misrepresent the course of conduct and communications concerning the unused inventory." (Compl. ¶ 39).

-17-

There is not an exhaustive list of conduct that is considered "wrongful." However, examples of wrongful conduct include: abuse of a fiduciary relationship, misrepresentations, violation of business ethics or customs, and conduct that violates a statute or public policy. *See Restatement (Second) of Torts*, § 769, cmt. d, and § 767, cmt. c. As an initial matter, the court notes that while "misrepresentation" is a type of wrongful conduct, ACS has not sufficiently alleged that Platinum made any misrepresentations. ACS alleges that Platinum caused Tecumseh to misrepresent the course of conduct and communications concerning the unused inventory. Not only does this allegation not involve Platinum making a misrepresentation, it also does not involve Platinum interfering with ACS's and Tecumseh's contractual relationship. The alleged misrepresentations (made by Tecumseh, not Platinum) regarding the conduct and communications concerning the unused inventory occurred *after* Tecumseh refused to buy the unused inventory resulting from the closing of its Dunlap facility. Thus, the alleged misrepresentations in no way contributed to the supposed interference (which was the alleged breach of the contract), they were, at best, a post hoc rationalization for Tecumseh's alleged breach. In contrast, the Restatement makes it clear that the wrongful means must be utilized to cause the interference (in this case, the breach). In sum, ACS has not alleged that Platinum actually misrepresented anything, and, additionally, the only misrepresentations ACS has alleged were made by Tecumseh after the breach

-18-

occurred.[6]  Accordingly, the alleged misrepresentations do not foreclose Platinum's invocation of the financial-privilege defense.

As for the other form of wrongful conduct Platinum allegedly engaged in, "disregard for corporate boundaries," the court finds that, though not enumerated in the Restatement, this is a type of conduct that could, depending on the facts, be considered "wrongful."   In the instant case, ACS has alleged that "Platinum improperly inserted itself into the day-to-day decision making and management responsibilities of [Tecumseh]." (Compl. ¶ 29).  Such superficial language offers no insight into what types of actions Platinum allegedly engaged in.  However, given that privilege is a defense on which Platinum will bear the burden, and given that dismissal of ACS's claim is only justified if the defense is *impenetrably* established, and given that wrongfulness of conduct is, by its nature, a factually intensive question, it would be improper for the court to dismiss ACS's tortious interference claim on this basis, at least as to the claims that Platinum disregarded corporate boundaries.

### C.    Sufficiency of the Pleading of the Tortious Interference Claim

In addition to claiming its financial-interest-privilege defense was impenetrably established by ACS's complaint, Platinum also claims that ACS's tortious

---

[6]  Further, it bears noting that typically for a misrepresentation to be tortious, it must be something that the other party would have justifiably relied upon.  The misrepresentations ACS alleges are not something ACS would have relied upon, they are representations that, if false, ACS would have immediately known were false, since they involved the course of conduct between ACS and Tecumseh.

-19-

interference claim should be dismissed because ACS has failed to sufficiently allege the elements of a tortious interference claim. Again, the elements for such a claim in Wisconsin are:

(1)     the plaintiff had a contract or prospective contractual relationship with a third party;
(2)     the defendant interfered with the relationship;
(3)     the interference was intentional;
(4)     a causal connection exists between the interference and the damages; and
(5)     the defendant was not justified or privileged to interfere.

*Brew City Redevelopment Group, LLC v. Ferchill Group*, 2006 WI 128, ¶ 37, n. 9, 724 N.W.2d 879. While ACS has pled each of these elements, Platinum takes issue with the fact that the pleadings lacked specificity, and were pled on "information and belief." ACS maintains that its pleadings are sufficient, but that it now possesses adequate facts to supplement its pleadings so as to provide greater specificity.[7] Since dismissal of ACS's tortious interference claim for failure to sufficiently plead such a claim would be without prejudice, the better exercise of the court's discretion in such matters suggests that Platinum's motion be granted and at the same time allow ACS to file its Amended Complaint setting forth a more detailed claim. The result will be a clearer and more specific complaint, which will serve to sharpen and clarify the issues in this case. At the same time, the court also notes that the one element which is in most need of clarification is the second element. ACS's present

---

[7] If ACS is capable of filing an Amended Complaint with specific allegations sufficient to moot Platinum's motion to dismiss ACS's tortious interference claim, then it should have done so to move this litigation forward, obviating the necessity of the court to expend its limited resources in addressing the issue.

-20-

complaint simply conclusorily states that Platinum intermeddled in Tecumseh's affairs and caused it to breach its contract with ACS. Additional facts as to the mode by which Platinum effectuated this alleged intermeddling appear necessary to avoid any further challenge to ACS's complaint.

## IV. Direct Participant Liability

Platinum has also moved to dismiss ACS's claim for "direct participant liability" against Platinum. Direct participant liability may lie against a corporation where the parent company directly participated in its subsidiary's unlawful actions. *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 756 (7th. Cir. 1989). The essence of a direct participant liability claim is not that the parent corporation acted independently against the victim, or that the parent corporation acted as an "aider and abettor," but rather that the parent, through its ownership interest, commanded – rather than merely cajoled – its subsidiary to commit the alleged wrong. *Id.* at 757. It is ACS's contention that Platinum disregarded corporate norms, and used its ownership interest in Tecumseh to compel Tecumseh to breach its contract with ACS.

Platinum moves this court to dismiss ACS's direct participant liability claim because, *inter alia*, Wisconsin has not recognized the doctrine of direct participant liability. ACS does not dispute that Wisconsin has not expressly adopted direct participant liability; however, ACS maintains that there is significant overlap between existing Wisconsin law and the direct participant doctrine, thus the court should not dismiss ACS's claim. ACS points to three cases as support for the notion that

-21-

Wisconsin, even if it has not expressly adopted direct participant liability, has essentially embraced the rationale of the doctrine.

The fist such case is *Miller v. Bristol-Myers Co.*, 485 N.W.2d 31 (Wis. 1992). *Miller* was a case in which the court held that a parent corporation could be liable to the employee of one of its subsidiaries, where the parent had inserted itself into the safety practices of its subsidiaries. *Id.* at 38-40. However, though *Miller* involves a parent corporation and its subsidiary, ACS overreaches in maintaining that *Miller* is in any way relevant to the issue of direct participant liability. The court in *Miller* was dealing exclusively with Section 324A of the *Restatement (Second) of Torts*. Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a)    his failure to exercise reasonable care increases the risk of such harm, or
> (b)    he has undertaken to perform a duty owed by the other to the third person, or
> (c)    the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Restatement (Second) of Torts*, § 324A. In *Miller*, the parent corporation had involved itself in the safety aspects of the construction of a material preparation room in which an employee was injured due to a fire. 485 N.W.2d at 33-36. The court explained that a "parent corporation assumes a duty of care to the employees of its subsidiary where it is found that the parent corporation (1) undertook to render

-22-

services, (2) to the subsidiary, (3) which the parent corporation should have recognized were necessary for the protection of the subsidiary's employees." *Id.* at 40. Thus, the court found that the parent corporation in *Miller*, due to its rendering of services as to the construction of the material preparation room, had assumed a duty to insure the existence of a safe material preparation room for its subsidiary's employees.

The *Miller* court's opinion does not offer any support for the proposition that Wisconsin courts would be willing to adopt direct participant liability. Indeed, in *Miller*, the court simply applied the elements of § 342A. The outcome would have been exactly the same regardless of whether the defendant was a parent company or not, so long as the elements of § 324A were met.

ACS also points to *Derzon v. New Oji Paper Co., Ltd.*, 2000 WI App 256, 2000 WL 1618403, and *Hafen v. Badgerland/Dairyland Harvestore Sys. Inc.*, 1995 WL 121408 (Wis. App. 1995) as evidence that Wisconsin law is amendable to the direct participant doctrine. In both *Derzon* and *Hafen*, the Wisconsin Court of Appeals – in explaining that the applicable plaintiffs had not stated a claim for imputing liability to a parent corporation for the acts of its subsidiary – cited to *Esmark* for the proposition that "a parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful conduct." Thus, *Derzon* and *Hafen* certainly do support the notion that adoption of the direct participant doctrine is consistent with Wisconsin law. One would

-23-

reasonably expect that if the doctrine were not consistent with Wisconsin law, then the state court of appeals would not be citing *Esmark* and explaining how a plaintiff has failed to plead direct participant liability.

On the other hand, of course, *Derzon* and *Hafen* are unpublished state appellate court[8] decisions that only mention *Esmark* and direct participant liability in passing. Thus, it is certainly conceivable that the courts found it simpler to explain that direct participant liability had not been sufficiently pled, rather than to determine whether the doctrine was applicable in Wisconsin, or to explain why it is not. At the end of the day, *Derzon* and *Hafen* do support ACS's contention, but only to a limited extent.

Juxtaposing the limited support offered by *Derzon* and *Hafen* are the clear teachings of the Seventh Circuit regarding the role of federal district courts in applying state law. The court is to apply the law as it believes the highest court of the state would apply it. *Association Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). However, the court should not "speculate on any trends in state law." *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987). "This policy applies with special force to a plaintiff in a diversity case who has chosen to litigate his state law claim in federal court." Federal courts are to respect that

---

[8] When state law furnishes the governing law of a federal case, it is the role of the federal court to apply the substantive law of the state as it believes the highest court of that state would apply it. *Association Ben. Services, Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007). In Wisconsin, the highest court in the state is the Wisconsin Supreme Court, not the Wisconsin Court of Appeals.

Case 2:09-cv-00778-JPS    Filed 07/07/10    Page 24 of 28    Document 31

state courts are "the primary expositors of state law," *Gust K. Newberg Constr. Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987). Thus, federal courts should not "anticipate changes to state law in the absence of concrete evidence that the state court would adopt that position today." *Hollander v. Brown*, 457 F.3d 688, 692 (7th Cir.2006). This is true even if the proposed legal theory is one that the court itself may consider worthy of adoption. *See Loucks v. Star Glass Co.*, 551 F.2d 745, 746 (7th Cir. 1977) ("[I]t is not our province as a federal appellate court to fashion for Illinois what we are certain many would say was a wise and progressive social policy.").

Admittedly, in the instant case it is difficult to determine whether ACS's direct participant claim should be dismissed. The doctrine is mentioned (seemingly approvingly) in two Wisconsin appellate court opinions. Additionally, the doctrine itself is not particularly "novel." *See Esmark*, 887 F.2d at 755-57 (explaining basis for direct participant liability, and collecting cases applying doctrine). Thus, it is not at all unreasonable to think Wisconsin would adopt direct participant liability. However, two unpublished state appellate court opinions mentioning the doctrine in passing, coupled with the generally accepted nature of the doctrine, is simply not enough for this court to say that there is concrete evidence that the Wisconsin Supreme Court would adopt direct participant liability today. Accordingly, ACS's direct participant liability claim against Platinum must be dismissed. *See Hollander*, 457 F.3d at 692 (Indeed, we have warned litigants that those who seek to base their

claims on an innovation in state law would be well-advised to file their claims in state court.").

## V. Declaratory and Injunctive Relief

ACS is of the belief that Platinum is causing Tecumseh to sell off its assets, thus meaning that even if ACS eventually obtains a judgment against Tecumseh, there could be no assets left to collect against.[9]  Thus ACS has sought the following:

> [D]eclaratory relief determining the rights and obligations of ACS, TecumsehPower, and Platinum, including (without limitation) a ruling determining (a) whether TecumsehPower is insolvent; (b) whether TecumsehPower, acting on its own or acting at the direction and instigation of Platinum, is wrongfully divesting itself of substantial assets without making appropriate provisions for the rights of ACS as a creditor; and (c) whether and to what extent assets (and the proceeds of such assets) have been wrongfully diverted.
>
> ACS likewise seeks injunctive relief to the extent the Court deems it appropriate and necessary to preserve and protect the rights and to enforce the obligations deemed to exist as a result of this Court's declaratory ruling.

(Compl. ¶¶ 58-59).

The problem with ACS's declaratory and injunctive relief claims is that ACS has no judgment against Tecumseh on which it is seeking to collect.  At the moment ACS is merely a litigant with a breach of contract claim and a tortious interference claim.  It simply is not entitled to the type of relief it seeks.  Indeed, havoc would certainly ensue if every party alleging breach of contract were permitted to pursue discovery of their adversary's internal financials by tacking on a declaratory relief

---

[9] Of course, since the court is allowing ACS to amend its tortious interference claim, ACS could conceivably still collect directly against Platinum.

-26-

claim similar to ACS's. Thus, Fed. R. Civ. P. 26(b)(1) articulates the scope of discovery as "nonprivileged matter that is *relevant* to any party's *claim* or *defense*." The present status of Tecumseh's financials have no bearing on whether Tecumseh breached its contract with ACS, or whether Platinum tortiously caused Tecumseh to breach its contract with ACS. Accordingly, ACS's declaratory and injunctive relief claims will be dismissed.

## CONCLUSION

A reading of the contract between ACS and Tecumseh clearly evidences that ACS's breach of contract claim should not be dismissed. At best (for Tecumseh), the contract is ambiguous; at worst (for Tecumseh), the contract clearly required Tecumseh to purchase unused inventory up to the maximum stock levels. Given the procedural posture of the case, it is sufficient to determine that ACS's breach of contract claim should not be dismissed. As for the matter of whether ACS's tortious interference claim against Platinum should be dismissed, the court finds that, given how close ACS's claim is to being sufficient pled, and given that ACS maintains that it can amend its claim to add greater specificity, the best course of action is to dismiss the tortious interference claim without prejudice, and to allow ACS to amend its complaint in order to plead the claim with additional detail. However, as to the direct participant liability claim ACS asserts against Platinum, the court finds that such a cause of action has not been clearly adopted by Wisconsin law and must, therefore, be dismissed. Similarly, ACS's declaratory and injunctive relief claim must

be dismissed as such claim seeks discovery and relief not appropriate in the circumstances.

Accordingly,

**IT IS ORDERED** that defendants' Motion to Dismiss (Docket #17) be and the same is hereby **DENIED** in part, and **GRANTED** in part, as set forth herein.

Dated at Milwaukee, Wisconsin, this 7th day of July, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

-28-